## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**BRANDY HARRISON,**

        **Plaintiff,**

**v.**                               **CASE NO.: 8:17-cv-1369-T-02CPT**

**CITY OF TAMPA, a municipal**
**Florida Corporation, and**
**TECHSTAFF, INC., of TAMPA,**
**a Florida entity operating in Florida, and**
**ADAM MAINZER, in his person capacity**

        **Defendants.**

_____/

## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

The Defendant, the City of Tampa, ("Defendant" or "City"), moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for a grant of summary judgment in its favor on all claims brought by the Plaintiff, Brandy Harrison, ("Plaintiff"). The Plaintiff was an employee of Techstaff, Inc., ("Techstaff"), who was on assignment as a contractor with the City in its Water Department. Her assignment with the City was terminated after a City employee complained that the Plaintiff was harassing him by, among other things, sending threatening and inappropriate text messages. The Plaintiff admits that she sent the text messages.

The Plaintiff has brought suit against the City claiming violations of Title VII for sex harassment and hostile work environment, sex discrimination, and retaliation, and violations of Florida tort law for negligent retention based on the alleged sex harassment. For the reasons more fully stated in the memorandum of law, the Court should grant the City summary judgment on all claims because there are no genuine issues of material fact and the City is entitled to judgment as a matter of law. The Plaintiff cannot establish a basis for employer

liability on the sex harassment and hostile work environment claims because the City had policies and procedures in effect which prohibited sex harassment and the Plaintiff failed to promptly report to the City the alleged harassing conduct. When she did report the alleged conduct, the City promptly acted and took appropriate remedial action against the alleged harassers. Moreover, the Plaintiff cannot demonstrate that the alleged conduct was sufficiently severe or pervasive to constitute sex harassment. For the alleged discrimination and retaliation claims, the City had a legitimate, nondiscriminatory reason for terminating the Plaintiff's assignment and she cannot demonstrate that the reason was a pretext and the real reason was intentional discrimination or retaliation. The Plaintiff's negligence claim fails because, as a matter of law, there is no Florida common law tort of sexual harassment and therefore no grounds for a negligent retention claim. The City is also entitled to sovereign immunity.

## MEMORANDUM OF LAW

### I.     Factual and Procedural Background

#### A.      The City of Tampa

1.      The City of Tampa Water Department ("Water Department") is one of many departments in the City. (Marple Affidavit ("Aff.") ¶ 5). The director of the department is Chuck Weber. (Marple 38:24-25).[1] Separate and apart from the Water Department is the City's Human Resources Department ("HR"). (Aff. ¶¶ 3, 5). The director of the City's HR is Kimberly Crum. (Marple 4:2-5); (Aff. ¶ 4). All terminations and formal disciplinary actions for City employees must be approved by Crum, who reviews the action based on the recommendation of the appropriate department director. (Marple 36:19-37:1); (Aff. ¶ 4). This

---

[1] Depositions will be cited by reference to the deponent's last name followed by the page and line number(s).

review and approval by Crum ensures that there is a uniform application of the City's policies and disciplinary actions. (Aff. ¶ 4).

### B.     Techstaff and the Plaintiff's assignment with the City

2.      The Plaintiff was employed by the staffing company Techstaff as a work order technician. (Doc. 36 ¶ 17); (Plaintiff ("Pl.") 17:22-24, 21:15-17, 24:14-20). Techstaff contracted with the City to provide staff supplements and, as part of those services, the Plaintiff was assigned to work with the City starting in April 2016. (Doc. 36 ¶¶ 18-19); (Pl. 23:16-21).

3.      The Plaintiff's assignment with the City was in the Water Department. (Doc. 36 ¶ 20). Her immediate City supervisor for that assignment was Ron Calderoni, the City's Water Distribution Senior Team Leader. (Pl. 24:21-24); (Marple 61:24-62:5). Calderoni had no authority to terminate employees or otherwise take formal disciplinary action against them. (Aff. ¶ 6). Calderoni reported directly to Eli Franco, the City's Water Distribution and Consumer Services Manager, who reported to Weber. (Pl. 24:21-25:2); (Marple 36:11-12, 44:14-17); (Aff. ¶ 7). Tim Johnson, a Utility Technician II (Interim Team Leader), was not in the Plaintiff's chain of command with the City and had no supervisory role over the Plaintiff. (Aff. ¶ 8). Johnson had no authority to take any disciplinary or other action against the Plaintiff that affected her assignment with the City. (Aff. ¶ 8).

4.      Even though the Plaintiff was not an employee of the City, she could still make a complaint of alleged sex harassment to the City's HR for investigation.[2] (Marple 8:15-9:5).

---

[2] The City is an equal opportunity employer. In the City's Personnel Manual, sections B1.1 and B1.2., the City specifically prohibits discrimination and harassment based on protected characteristics, including sex. (Marple 6:1-11); (Aff. ¶ 10, Ex. A Bates stamp number ("BS#") 000914-18). The Personnel Manual also provides a complaint mechanism for sex harassment claims. (Marple 15:8-11); (Aff. ¶ 10, Ex. A BS# 000914-18). If the allegations of harassment are sustained as a violation of City policy, the harasser can be terminated. (Aff. ¶ 10, Ex. A BS# 000914-18).

All complaints of sex harassment received by the City are investigated by the City's HR. (Marple 4:25-5:14, 15:8-11, 54:23-55:19). The investigation conducted by the City's HR is independent of the department involved. (Marple 4:25-5:14, 15:8-11, 16:17-18:6, 54:23-55:19). In addition to being able to complain to the City, the Plaintiff could utilize any complaint mechanism established by her employer Techstaff. (Marple 8:15-9:5).

### C.   The Plaintiff makes a complaint against Johnson and the City takes prompt remedial action

5.     At the start of her assignment with the City in April 2016, the Plaintiff admits that she had no issues with any employees. (Pl. 23:16-21, 27:14-18). The first time she reported any alleged issues to the City was on May 24, 2016. (Doc. 36 ¶ 35). That day, she notified Calderoni that Johnson was engaging in alleged conduct she believed to be inappropriate, such as leaving her sticky notes at work. (Doc. 36 ¶ 35); (Pl. Ex. 7 at ¶ 6); (Pl. 33:2-18, Ex. 1); (Marple 30:10-20, 45:13-46:5). It is undisputed that the Plaintiff did not inform Calderoni that she believed he (Calderoni) was engaged in any inappropriate conduct. (Pl. 34:9-35:9).

6.     Calderoni immediately informed his superiors of the Plaintiff's allegations against Johnson. On May 25, 2016, the day after the report, the Plaintiff was called into a meeting with Franco, Pat Leonard, the City's Water Distribution Operator Supervisor, and Calderoni to discuss the matter. (Doc. 36 ¶ 36); (Pl. Ex. 7 at ¶ 6); (Pl. 35:13-36:3); (Marple 46:19-47:15, 48:7-17).

7.     Because the nature of the report involved a potential sex-based claim, the matter was referred to the City's HR. On May 25th the Plaintiff was called into a meeting with Rebecca Lukban, Employee Relations Specialist in the City's HR, Franco, and others. (Doc. 36 ¶ 36); (Pl. Ex. 7 at ¶ 6); (Pl. 35:13-36:3); (Marple 46:19-47:15, 48:7-21). During that

meeting, Lukban asked the Plaintiff to provide a detailed account of the alleged harassment by Johnson. (Doc. 36 ¶ 37). In the Plaintiff's own words, she "reluctantly" provided the requested information. (Doc. 36 ¶ 38). It is undisputed that the Plaintiff did not allege Calderoni or anyone other than Johnson was engaging in any alleged sex harassment. (Doc. 36 ¶ 39); (Pl. 37:10-13); (Marple 45:13-24, 46:19-47:15, 48:18-21). At the meeting, the Plaintiff expressed that she wanted the behavior by Johnson to stop, but she did not want him to get into trouble. (Aff. ¶ 11, Ex. B BS# 000760, 766-68).

8.    The Plaintiff provided the City with notes that Johnson allegedly left her. The notes asked the Plaintiff to "[t]ake a picture of yourself" and send it to him, asked her if she would like to meet for dinner and whether they were still on for a happy hour, asked other non-work related questions, and commented that she looked "good as hell." (Pl. 30:13-31:9, 31:24-32:10, Ex. 1). The Plaintiff further claimed that Johnson had been contacting her via text and Facebook messages, mostly outside of work hours. (Pl. 38:2-10, Ex. 2). The Facebook messages included comments such as: "you look Amazing," "Damn you are so Sexy," "You have a lovely smile," you are an "attractive Woman," "Your legs are so Sexy, I can spoil you," "Sexy Red," "your [sic] a very Sexy and Pretty Woman," and others along those lines as well as emojis. (Pl. Ex. 2). At the beginning of the communications, the Plaintiff responded by thanking Johnson and sending smile emojis back to him. (Pl. Ex. 2). At one point, though, she stated that "[Johnson] your [sic] doing too much.. Smh." (Pl. Ex. 2). In response, Johnson replied "Okay, good night." (Pl. Ex. 2). In addition to the communications, she claimed that Johnson provided her gifts of shoes and underwear, which she admitted to keeping in a box but claimed the gifts made her uncomfortable. (Marple 46:6-18); (Pl. 106:19-108:1).

9.      The City's HR conducted an investigation into the Plaintiff's allegations. On May 26, 2016, Johnson was called into to a meeting with Lukban, Franco, and Leonard regarding the Plaintiff's allegations. (Aff. ¶ 11, Ex. B BS# 000762-65). Johnson admitted to leaving the Plaintiff notes and contacting her outside of work via text message and Facebook. *See* (Aff. ¶ 12, Ex. C BS# 000752); *see also* (Aff. ¶ 16, Ex. G BS# 000784-85). Johnson was directed to stop the non-work related contact with the Plaintiff and warned of the consequences should he fail to heed to the directive. (Marple 48:22-49:9).

10.     As a follow-up to this directive, Franco issued Johnson a "Letter of Counseling" on May 31, 2016. (Aff. ¶ 12, Ex. C BS# 000752); (Marple 48:22-49:9). The letter stated:

> As a result of an initial complaint brought to our attention by [the Plaintiff], we asked you as series of questions regarding your actions involving this employee. You confirmed by your responses that you had contact with this individual outside of normal work hours through a variety of communication methods, and that the nature of that contact was personal not business. It was pointed out to you that the employee wishes for you to stop all non-work related contact with her immediately, and you agreed to comply. Failure to do so can result in a variety of steps the organization might be obligated to take including progressive discipline and referring the matter to Tampa Police.
>
> As a result of your apparent lapse in judgment, I have included copies of Policy B1.1 – Equal Opportunity, and B24.1 – Anti-Fraternization, and highlighted sections that you should familiarize yourself with in order to avoid a possible repeat of this behavior in the future.
>
> I trust that you have heard the employee and the organization loud and clear on this matter.

(Aff. ¶ 12, Ex. C BS# 000752-58).

11.     The Plaintiff received no discipline for reporting Johnson's conduct to the City.

**D.      The Plaintiff reports alleged hearsay rumors**

12.     In the immediate aftermath of her complaint and the HR's investigation the

Plaintiff claims the non-work communication between herself and Johnson ceased. (Pl. 109:24-110:12). According to the Plaintiff, Johnson communicated through another employee that he was sorry for what happened and she accepted the apology. (Pl. 110:22-111:4). Thereafter, Johnson told the Plaintiff that "he was really sorry about what was going on." (Pl. 111:5-12). The Plaintiff responded that "it was okay," that Johnson "wasn't a murderer or a bad person," and he just "needed to work on" how he "dealt and approached" her. (Pl. 111:5-12).

13.     But on June 2, 2016, the Plaintiff reported to Calderoni that she heard hearsay that Johnson was allegedly spreading rumors about her. (Pl. 42:1-7); (Marple 49:10-14); (Aff. ¶ 15, Ex. F BS# 000745). There was no report at this time that Johnson was directly communicating with the Plaintiff on non-work related matters or otherwise engaging in any harassment or other conduct based on sex. (Aff. ¶ 15, Ex. F BS# 000745). The Plaintiff reported also for the first time alleged conduct by other individuals, such as Mike Rafferty who she claimed approached her and exchanged words with her. (Pl. 42:8-15); (Aff. ¶ 15, Ex. F BS# 000745). The Plaintiff does not remember what Rafferty said other than she did not like it. (Pl. 42:8-24). She does not know whether Rafferty's conduct was based on sex.[3] (Pl. 42:20-22).

14.     The next day, June 3rd, Calderoni reported the matter to Lukban and Franco. (Marple 49:10-17). The Plaintiff did not disclose any alleged inappropriate conduct by

---

[3] That same day, Calderoni observed the Plaintiff "horsing around" with Rafferty. (Aff. ¶ 15, Ex. F BS# 000745-46). Calderoni advised the Plaintiff that she had work to perform. (Aff. ¶ 15, Ex. F BS# 000745-46). Later that day, Calderoni observed the Plaintiff conversing with Christie Blount for approximately forty-five minutes, well in excess of her fifteen minute break time. (Aff. ¶ 15, Ex. F BS# 000746).

On June 3, 2016, the Plaintiff approached Calderoni to talk regarding, among other things, the matter with Blount claiming that Blount called her out on gossip. (Aff. ¶ 15, Ex. F BS# 000747). Calderoni told the Plaintiff to avoid these type of interactions and keep her interactions job related. (Aff. ¶ 15, Ex. F BS# 000747).

At one point the Plaintiff asked Calderoni if she could go to his office because it felt "tense" at work. (Pl. Ex. 4). According to the Plaintiff, the tension related to the fact that some individuals believed Calderoni showed her favoritism because he gave her a City t-shirt and had meals with her. (Pl. 61:13-63:4).

Calderoni, nor did she express any fear about going to him. (Marple 49:18-25). Calderoni also reported some behavioral issues that he had documented for the Plaintiff. (Aff. ¶ 15, Ex. F BS# 000745-47).

### E.   Marquis Wright files a harassment complaint against the Plaintiff

15.     At some point, the Plaintiff entered into what she concedes was a mutual relationship with Marquis Wright, a City Utility Technician II (Interim Team Leader), but that relationship ended. (Pl. 48:4-7, 48:21-23). On June 29, 2016, Wright approached Calderoni to disclose that he (Wright) was scared of the Plaintiff and felt harassed by her. (Marple 26:10-20, 44:9-22, 50:13-18, 53:18-20, 64:10-11); (Pl. 48:4-14, 49:8-11). Among other things, Wright reported that the Plaintiff sent him text messages of a threatening nature. (Marple 26:10-20, 44:9-22, 50:13-18).

16.     After receiving this complaint, Calderoni reported the matter to Franco. (Marple 44:9-22, 50:19-23, 51:10-16). That same day, June 29th, Wright met with Franco and Leonard about his (Wright's) complaint against the Plaintiff. (Marple 44:9-22, 50:19-23). Wright provided the City with several text messages that the Plaintiff sent him. (Pl. 65:10-13, Ex. 5); (Marple 26:10-20, 50:19-23, 51:10-16, 52:13-15, 53:4-13). The text messages included:

> Fwd: Asking for it now so. . . Lemme know otherwise i am gone do what i
> originally planned. . Glad u picked up the phone bc trust you was gone have a
> bad night
> Fwd: U not gonna be able to run from this. . . . Like u do everything else
> Fwd: Yep. . . Bet that ass hush mouth nah. . . See where being selfish and nasty
> gets u. . . Im just as nasty if not even worse. . .  You hurt me imma hurt you
> back
> Fwd: Why mr. Eli [Franco] want to meet with u? Did u say something to
> anybody
> Fwd: All your [sic] doing is further pissin me off

(Pl. 65:10-13, Ex. 5).

17.     Based on the nature of Wright's allegations against the Plaintiff, Franco reported the matter to the City's HR on June 29, 2016. (Marple 50:24-52:4, 53:18-20); (Aff. ¶ 13, Ex. D BS# 000770). Wright received no disciplinary action for making a harassment complaint. (Marple 64:7-65:3).

**F.     The Plaintiff makes a new complaint alleging Johnson and Calderoni were harassing her**

18.     At or around the same time, the Plaintiff made a complaint to Adam Mainzer of Techstaff that Calderoni was engaged in inappropriate conduct. (Pl. 50:12-17); (Marple 43:25-44:7). Mainzer has no employee relationship with the City. (Aff. ¶ 14); (Doc. 36 ¶ 4); (Pl. 20:9-13). At Mainzer's request, the Plaintiff drafted notes about Calderoni's alleged conduct.[4] (Pl. 82:1-100:9, 104:18-105:12, Ex. 8[5]). According to the Plaintiff, Calderoni would comment that he was "attracted to black women," that she looked "good" and "was pretty," and whether she "had intercourse over the weekend." (Pl. 96:7-97:9). He also allegedly asked the Plaintiff whether she strip danced before and if she made a lot of money. (Pl. Ex. 8). In addition to the comments, the Plaintiff claimed he touched her inappropriately in her private area, but does not remember when this happened or how often. (Pl. 99:19-100:8, Ex. 8). On other occasions, the Plaintiff claimed that he "hug[ged] and kiss[ed]" her. (Pl. 99:16-18, 104:18-105:7, Ex. 8).

19.     On June 29, 2016, the same day that Wright made a complaint to the City about

---

[4] The notes reference, among other things, the Plaintiff's claim that Calderoni would become enraged when males talked to the Plaintiff during work hours and then started "dangling my job over my head." (Pl. 83:8-84:21, Ex. 8). The Plaintiff does not tie this alleged threat to any demand or request for sexual favors. It is undisputed that Calderoni never recommended discipline for the Plaintiff or gave her a poor performance review. (Pl. 113:3-114:5, 122:9-20).

[5] The last page of the exhibit is an alleged note from Johnson. (Pl. 105:13-106:9, Ex. 8).

the Plaintiff's harassment of him, Crum was contacted by Mainzer and told that the Plaintiff was making a complaint regarding alleged conduct by Johnson and Calderoni. (Marple 43:25-45:12, 50:24-52:7, 56:2-9). Prior to this report on June 29, 2016, the City had no knowledge that the Plaintiff believed Calderoni was harassing her. (Marple 45:13-24).

> ### G.    The City's HR conducts concurrent investigations into the complaints made by Wright and the Plaintiff, and terminates the Plaintiff's assignment based on the text messages she sent to Wright

20.    The City's HR initiated two concurrent investigations: one into Wright's complaint that the Plaintiff was harassing him, and one into the Plaintiff's complaint that Calderoni and Johnson were harassing her. (Marple 26:10-27:7, 30:10-31:7, 32:16-33:4).

21.    On June 30, 2016, Crum and Kimberley Marple, Employee Relations Specialist Supervisor in the City's HR, interviewed Calderoni as part of HR's investigation into the Plaintiff's allegations. (Marple 3:16-21, 56:2-18); (Aff. ¶ 14, Ex. E BS# 000693-98). In the interview, Calderoni admitted to engaging in some of the conduct that was alleged, but denied the other allegations that were made. (Marple 56:2-25). For example, he admitted to hugging the Plaintiff, but claimed he did that for everyone and that such acts were in his "nature." (Aff. ¶ 14, Ex. E BS# 000693). He also admitted to kissing the Plaintiff on the cheek a "few times." (Aff. ¶ 14, Ex. E BS# 000696).  Calderoni further admitted to buying the Plaintiff food, but claimed this was something that he did for everyone. (Aff. ¶ 14, Ex. E BS# 000697).

22.    The City's HR promptly scheduled an interview with the Plaintiff to address her allegations against Calderoni and Johnson. (Marple 56:24-57:5). On July 1, 2016, Crum and Marple met with the Plaintiff and Mainzer. (Marple 18:13-19:1, 21:20-22:3, 23:10-16, 57:6-15); (Pl. 49:24-50:11); (Aff. ¶ 14, Ex. E BS# 000681-90). During the meeting, the

Plaintiff provided the City copies of text messages from Johnson and Calderoni and other evidence that she believed supported her allegations. (Pl. Ex. 1, Ex. 2, Ex. 3, Ex. 4); (Marple 27:16-22, 31:22-32:15, 52:15-24). The Plaintiff alleged that Johnson sent her text messages, a Facebook friend request, and a book titled "Dirty Little Secrets" which was delivered by another person. (Pl. 109:25-110:6, Ex. 7 at ¶ 7); *see also* (Pl. Ex. 2 at BS# 0016-22, Ex. 3); (Marple 50:1-12). She also accused Calderoni of engaging in inappropriate conduct, including unwanted sexual advances and inappropriate touching, unwanted text messages, intimidation regarding employment status, and other conduct described above in her report to Mainzer. (Aff. ¶ 14, Ex. E BS# 000681-90); (Aff. ¶ 17, Ex. H BS# 000774-75).

23.     As part of the concurrent investigation into Wright's complaint, the Plaintiff was questioned about the text messages Wright provided the City. (Marple 26:21-27:10); (Pl. 64:1-65:3). The Plaintiff confirmed that she sent the text messages to Wright. (Pl. 65:10-13, Ex. 5). Because the text messages were of a threatening and inappropriate nature, the Plaintiff was informed that she would no longer be permitted to perform services for the City through Techstaff. (Marple 27:23-28:11); (Pl. 21:6-10); (Doc. 36 ¶ 49). The City did not direct or request Techstaff to take any action with respect to the Plaintiff's employment with Techstaff. (Aff. ¶ 9). Her employment relationship with Techstaff remained unchanged.[6] (Pl. 19:20-20:1).

24.     At this meeting the Plaintiff informed the City's HR for the first time that Wright was allegedly coming to her house during work hours for the City and altering his work orders for the City.[7] (Pl. 74:5-75:22); (Marple 53:21-54:3). Because falsification of time is not

---

[6] Techstaff did not provide the Plaintiff a new placement, but she does not know the reason. (Pl. 19:20-20:16).
[7] The Plaintiff did not previously report any issues with Wright's time records. (Pl. 68:2-23).

a discrimination or harassment complaint, an investigation into such conduct is handled at the department level. (Marple 28:16-29:13, 29:23-30:3, 54:10-22, 54:23-55:19). The matter was turned over to Leonard for an investigation to determine whether there had been a violation of Personnel Manual B28.2 which, if sustained, could lead to termination.[8] (Marple 28:16-29:13, 29:23-30:3). The Plaintiff never accused Wright of any harassment based on sex or any other protected characteristic. (Marple 55:7-15).

25.     Although the Plaintiff was no longer going to be working with the City, HR continued to investigate the Plaintiff's claims related to Johnson and Calderoni. From July 6 to July 8, 2016, Crum and Marple interviewed Renee Surgeon-Jones, Work Order Technician, Linda Coleman-Davis, Work Order Technician, Wanda Hernandez, Water Distribution Planner/Scheduler, Yolanda Davis, Water Distribution Planner/Scheduler, Shawn Thomas, Utility Technician III, and Demetrious Wilson, Utility Technician III as part of the investigation. (Marple 57:21-58:10); (Aff. ¶ 14, Ex. E BS# 000703-20).

26.     On July 21, 2016, Calderoni was interviewed by the City's HR a second time. (Aff. ¶ 14, Ex. E BS# 000699-702). During this interview, Calderoni was confronted with the text messages and other evidence provided by the Plaintiff. (Marple 31:22-32:11).

27.     The City's HR also conducted two interviews of Johnson, on July 26 and July 27, 2016, respectively. (Marple 58:19-25) (Affidavit at BS# 000674-80). Although Johnson initially denied much of the conduct, he was confronted with the text messages and other evidence provided by the Plaintiff. (Marple 31:22-32:11); (Aff. ¶ 14, Ex. E BS# 000674-80).

---

[8] This investigation did not find any inconsistencies with Wright's time records. (Marple 29:10-19, 33:19-34:19, 54:10-22). As a result, Wright received no disciplinary action. (Marple 29:10-19, 34:15-19).

Johnson thereafter admitted to continuing to communicate with the Plaintiff despite the prior directive. (Aff. ¶ 14, Ex. E BS# 000674-80).

28.     The investigation continued with Crum and Marple interviewing Ted Wagner, Safety & Loss Prevention Specialist, and Janalise Toole, TechStaff temporary employee, on August 2, 2016. (Marple 59:1-11); (Aff. ¶ 14, Ex. E BS# 000718-20, 000723-27).

### H.     Calderoni and Johnson are terminated by the City

29.     Based on the information discovered during the course of the investigation, the City prepared notice of disciplinary actions for Calderoni and Johnson. (Marple 31:3-17). The draft notice of disciplinary actions charged Calderoni and Johnson with potential violations of City Personnel Manual B1.1A(4)(d), Equal Opportunity for alleged sexual harassment and hostile work environment. (Aff. ¶¶ 16-17, Ex. G BS# 000784-85, Ex. H BS# 000774-75). Additionally, Johnson was charged with a potential violation of City Personnel Manual B28.2A(3)(d)(1), Moral Turpitude, for being untruthful in his statements to HR. (Marple 31:22-32:10); (Aff. ¶ 16, Ex. G BS# 000784-86). Based on their employment status with the City and the nature of the contemplated disciplinary action, Calderoni and Johnson were entitled to a due process pre-disciplinary hearing to provide their side of the story prior to discipline being imposed. (Marple 31:10-21, 59:12-24).

30.     On August 17, 2016, the City held a pre-disciplinary hearing for Calderoni. (Marple 59:12-14); (Aff. ¶ 17, Ex. H BS# 000774-75); (Aff. ¶ 14, Ex. E BS# 000671-73). After the hearing was conducted, Calderoni was informed that his employment would be terminated. (Marple 31:19-21, 59:25-60:8); (Aff. ¶ 17, Ex. H BS# 000774-75). Calderoni resigned in lieu of termination. (Marple 31:19-21, 59:25-60:8).

31.   On August 18, 2016, the City held a pre-disciplinary hearing for Johnson. (Marple 60:9-13); (Aff. ¶ 16, Ex. G BS# 000784-85); (Aff. ¶ 14, Ex. E BS# 000670). Johnson was informed after the hearing that his employment would be terminated. (Marple 31:19-21, 60:9-22); (Aff. ¶ 16, Ex. G BS# 000784-85). Johnson resigned in lieu of termination. (Marple 31:19-21, 60:9-22).

## I.   Procedural background

The Plaintiff's amended complaint asserts four counts against the City.[9] In count I, she alleges the City "discriminated against" her and "subjected her to gender-based harassment and gender-based hostile work environment because of her sex" in violation of Title VII. (Doc. 36 ¶ 60). In count II, she asserts a negligent retention claim against the City claiming the City knew or should have known that Calderoni and Johnson subjected females to sexual advances and harassment, but failed to take appropriate action. (*Id*. ¶¶ 61-65). In count VI, she asserts a Title VII "hostile environment sexual harassment" claim. (*Id*. ¶¶ 80-102). And in count VII she asserts a Title VII retaliation claim. (*Id*. ¶¶ 103-14).

The Court should grant the City summary judgment on all claims because there are no genuine issues of material fact and the City is entitled to judgment as a matter of law.

## II.   Legal Argument

### A.   Summary judgment should be granted on the Plaintiff's negligence claim

The Plaintiff asserts that the City was negligent because it continued to retain Calderoni and Johnson despite alleged knowledge of their "unlawful sexual advances ad [sic] harassment during work hours." (Doc. 36 ¶¶ 61-65). To establish a claim for negligent retention, the

---

[9] The Plaintiff voluntarily dismissed the claims against Techstaff and Mainzer. (Doc. 40); (Doc. 54).

14

alleged underlying wrong "must be based on an injury resulting from a tort which is recognized under common law" in Florida. *Wheeler v. Blackbear Two, LLC*, 2012 WL 3596128, *2 (M.D. Fla. 2012) (citing *Martinez v. Pavex Corp.*, 422 F. Supp. 2d 1284, 1298 (M.D. Fla. 2006) and *Scelta v. Delicatessen Support Servs., Inc.*, 57 F. Supp. 2d 1327, 1348 (M.D. Fla. 1999)). There is no Florida common law tort for sexual harassment. *Scelta*, 57 F. Supp. 2d at 1348; *Wheeler*, 2012 WL 3596128 at *2; *see also City of Miami Beach v. Guerra*, 746 So. 2d 1159, 1159-60 (Fla. 3d DCA 1999); *Castleberry v. Edward M. Chadbourne, Inc.*, 810 So. 2d 1028, 1030-31 (Fla. 1st DCA 2002); *Footstar Corp. v. Doe*, 932 So. 2d 1272, 1278 (Fla. 2d DCA 2006) (Casaneueva, J. concurring specifically). Accordingly, the Plaintiff's negligent retention claim fails as a matter of law.[10] *Wheeler*, 2012 WL 3596128 at *2; *Vernon v. Med. Mgmt. Assoc. of Margate*, 912 F. Supp. 1549, 1563-64 (S.D. Fla. 1996); *Scherff v. Simba Group, LLC*, 2010 WL 11504720, *9 (S.D. Fla. 2010) (collecting cases); *see also Guerra*, 746 So. 2d at 1159-60; *Castleberry*, 810 So. 2d at 1030-31. Moreover, the claim must fail because the Plaintiff failed to provide the requisite notice prior to filing a negligence suit. § 768.28(6)(a), Fla. Stat. (2016).

**B.**     **Summary judgment should be granted on the Plaintiff's sexual harassment and hostile work environment claims**

The Plaintiff cannot establish that the City is liable for sexual harassment and/or a hostile work environment based on sex. To establish a prima facie claim, she must show that:

> (1) . . . she belonged to a protected group, (2) . . . she was subjected to unwelcome harassment, (3) the harassment was based on a protected

---

[10] Additionally, the Plaintiff cannot demonstrate the City was negligent in its retention of Calderoni and Johnson. The first time the Plaintiff reported alleged conduct by Johnson was May 24, 2016. The City promptly investigated the matter, directed Johnson to stop the non-work contact, and issued Johnson a letter of counseling. The City had no knowledge of any inappropriate conduct by Calderoni at this time. Indeed, it was not until June 29, 2016 that the City was informed by Mainzer that the Plaintiff was complaining about inappropriate conduct by Calderoni and Johnson. The City again promptly conducted an investigation. At the conclusion of the investigation, both Calderoni and Johnson resigned in lieu of termination. The City was not negligent.

characteristic, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of . . . her employment and create an abusive working environment, and (5) a basis exists for holding the employer liable.

*Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1195 (11th Cir. 2016); *see also Wilcox v. Corrs. Corp. of Am.*, 892 F.3d 1283, 1286-87 (11th Cir. 2018).

For the fifth element, a different analysis applies depending on whether the alleged harasser is a "supervisor" or a coworker. A "supervisor" is someone empowered to take tangible employment actions against the Plaintiff—"*i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Vance v. Ball State Univ.*, 570 U.S. 421, 424, 431, 450 (2013).

If the alleged harasser is a coworker, the City is liable only if it was negligent in controlling the working conditions. *Vance*, 570 U.S. at 424. This occurs if the City "knew or should have known of the harassing conduct but failed to take prompt remedial action." *Wilcox*, 892 F.3d at 1287; *see also Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 753 (11th Cir. 1996). "The 'remedial action' must be 'reasonably likely to prevent the misconduct from recurring.'" *Kilgore*, 93 F.3d at 754.

If the alleged harasser is considered a supervisor under Title VII, the City can still avoid liability by establishing the *Faragher/Ellerth* defense.[11] *Vance*, 570 U.S. at 424. This defense requires the City to establish that (1) it exercised reasonable care to prevent and correct harassing behavior and (2) that the Plaintiff "'unreasonably failed to take advantage of the

---

[11] As explained above, Calderoni never recommended discipline for the Plaintiff or gave her a poor performance review. (Pl. 113:3-114:5, 122:9-20). Because the Plaintiff does not allege that he took an adverse action against her, the City can avoid liability for the Plaintiff's sexual harassment claim by establishing the *Faragher/Ellerth* affirmative defense. *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001).

preventative or corrective opportunities.'" *Id.* at 424, 430; *see also Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1303 (11th Cir. 2007). For the first element, a policy or procedure which prevents harassment and provides for a reporting mechanism suffices. *Baldwin*, 480 F.3d at 1303. Once a complaint is received, courts look at whether the City "exercised reasonable care to correct promptly any sexually harassing behavior." *Id.* For the second element, the Plaintiff's failure can take two forms: "not using the procedures in place to promptly report any harassment and not taking advantage of any reasonable corrective measures the employer offers after the harassment is reported." *Id.* at 1306. Either type of failure is enough to establish the defense. *Id.*

### 1.    Johnson

The Plaintiff cannot establish a claim of sexual harassment or hostile work environment against the City based on Johnson's alleged conduct. Although the Plaintiff assigns Johnson the title of "supervisor" in her amended complaint, Johnson is not a supervisor for purposes of Title VII. Johnson was not the Plaintiff's direct supervisor for her City assignment and he had no authority to terminate or otherwise take a tangible employment action against her.

There is no basis to hold the City liable for Johnson's alleged conduct. The first time the Plaintiff claimed that Johnson engaged in any inappropriate conduct was on May 24, 2016 in her report to Calderoni. The Plaintiff's complaint was promptly forwarded up to the City's HR to conduct an investigation. The next day, May 25th, the Plaintiff was interviewed by HR regarding her complaint. Although she wanted the conduct to stop, she expressed that she did not want Johnson terminated. The investigation continued on May 26th with Johnson's interview. Johnson was directed to cease any non-work related contact with the Plaintiff. On

May 31, 2016, the City issued Johnson a letter of counseling specifically directing him to stop any inappropriate conduct, referring him to the City's policies on harassment and anti-fraternization, and informing him that further inappropriate conduct would result in disciplinary action. The City's action was both prompt and appropriate for the situation.

It is undisputed that the alleged conduct by Johnson initially stopped after the letter of counseling, but the Plaintiff claims new conduct occurred. The Plaintiff, however, did not report this alleged new conduct until June 29, 2016 when she informed Techstaff.[12] The City was made aware of the allegations that day and its HR commenced a new investigation. The Plaintiff does not allege any new harassment by Johnson occurred after the City became aware of her report of the new alleged conduct. As part of the investigation, the Plaintiff was interviewed on July 1, 2016 and Johnson was interviewed on July 26 and July 27, 2016. The City also conducted interviews of several other employees. After the investigation was completed, the City scheduled a pre-disciplinary meeting for Johnson on August 18, 2016. The City informed Johnson that he was being terminated. He resigned in lieu of termination. The City again took prompt remedial action in response to the Plaintiff's report of alleged inappropriate conduct. Summary judgment should be granted.[13] *See Patsalides v. City of Fort Pierce*, 724 F. App'x 749, 751-52 (11th Cir. 2018) (holding there was no employer liability for alleged sexual harassment because the employer promptly investigated the plaintiff's

---

[12] The June 2, 2016 report alleged that the Plaintiff heard hearsay that Johnson was spreading rumors. She did not allege any sexual harassment by Johnson.

[13] Assuming, *arguendo*, the Court finds that Johnson was a supervisor for purposes of Title VII, the City should still prevail on the claim under the *Faragher/Ellerth* affirmative defense. The City had policies and procedures which prohibited harassment based on sex and, for the same reasons explained above, took prompt remedial action to address the Plaintiff's complaints. Moreover, the Plaintiff did not immediately report the conduct by Johnson. *See Baldwin*, 480 F.3d at 1306-07.

allegations once she complained and took corrective action against the accused employee, who had a history of being accused of sexual harassment for which the employer took various corrective actions, thereby ensuring no further offensive conduct would occur).

Assuming, *arguendo*, the Plaintiff can establish a basis for employer liability, her claims still fail because, as a matter of law, Johnson's alleged conduct is not sufficiently severe or pervasive. To determine whether the alleged conduct is objectively severe or pervasive, courts look at "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza v. Borden, Inc*., 195 F.3d 1238, 1246 (11th Cir. 1998).

The Plaintiff does not allege that Johnson physically touched her. Rather, she alleges that Johnson sent her various forms of communications and gifts, which she kept. Many of the alleged text messages and Facebook posts occurred after work hours on personal devices and therefore are not grounds for a harassment claim against the City. *See Geggatt v. Deese*, 2009 WL 2913533, *5 (M.D. Fla. 2009) (explaining "as a general proposition, employers are not responsible under Title VII for hostile sexual acts resulting from nonwork-related, off-duty interactions between co-employees" (citations omitted)). Additionally, even if the Plaintiff subjectively believed the conduct was harassment, her belief was not objectively reasonable. As a matter of law, the flirtatious comments by Johnson do not rise to the level of conduct necessary for a harassment. *See*, *e.g.*, *Mendoza*, 195 F.3d at 1246-53; *Guthrie v. Waffle House, Inc*., 460 F. App'x 803, 804-08 (11th Cir. 2012). The alleged conduct also did not unreasonably interfere with the Plaintiff's job performance.

### 2.      Calderoni

Assuming for purposes of summary judgment only that Calderoni was the Plaintiff's supervisor under Title VII, the City is entitled to summary judgment based on the *Faragher/Ellerth* defense. The City has policies and procedures which prohibit sexual harassment and it enforces the policies and procedures by promptly investigating such complaints and taking remedial action when appropriate. The Plaintiff knew about this enforcement mechanism because her May 24, 2016 complaint against Johnson was promptly investigated by the City's HR and remedial action taken against Johnson. Despite the existence of this enforcement mechanism, as well as those offered by Techstaff, the Plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities.

Although the Plaintiff claims that Calderoni started harassing her shortly after she began her assignment with the City, it is undisputed that she failed to report the harassment at that time. She was interviewed by the City's HR on May 25, 2016 related to her allegations against Johnson and made no mention of any alleged inappropriate conduct by Calderoni. The first time she made any report related to Calderoni was more than a month later on June 29, 2016 to Techstaff,[14] which was forwarded to the City. The Plaintiff's delay in reporting the alleged conduct was unreasonable and effectively prohibited the City from addressing the alleged conduct before it escalated.[15] *Baldwin*, 480 F.3d at 1306-07. This failure alone is

---

[14] To the extent the Plaintiff claims she informally notified non-supervisors or non-HR representatives of the alleged conduct, such alleged disclosure would not put the City on notice. *See Frederick*, 246 F.3d at 1314 (citing, among others, *Madray v. Publix Supermarkets, Inc*., 208 F.3d 1290, 1302 (11th Cir. 2000) for the proposition that "amorphous complaints to persons not authorized to accept complaints constituted evidence that the employee unreasonably failed to take advantage of her employer's complaint procedures")).

[15] The Plaintiff cannot justify her failure to report the alleged conduct promptly based on her alleged fear that Calderoni could have allegedly taken action against her job. *See Baldwin*, 480 F.3d at 1307.

sufficient to satisfy the second element of the defense and precludes the Plaintiff from holding the City liable for the conduct. *Id*. at 1306.

Moreover, once the City became aware of the Plaintiff's complaint against Calderoni, the City took prompt action in conducting an investigation and prohibiting new alleged conduct. The Plaintiff does not allege any new harassment by Calderoni after she made a complaint against him. The day after the complaint was received by the City, Calderoni was interviewed as part of HR's investigation. On July 1, 2016, the Plaintiff was interviewed related to her allegations. After the City conducted interviews of several other employees, a second interview for Calderoni was conducted on July 21, 2016. Following the conclusion of the investigation, the City scheduled a pre-disciplinary meeting for Calderoni on August 17, 2016. Calderoni was informed that his employment would be terminated. He resigned in lieu of termination. Again, the City's remedial action was prompt and appropriate. There was no new alleged harassment by Calderoni once the City became aware of the alleged conduct. There is no basis to hold the City liable for any alleged conduct by Calderoni.

### C.   Summary judgment should be granted on the Plaintiff's disparate treatment sex discrimination and retaliation claims

The Plaintiff's disparate treatment sex discrimination and retaliation claims follow the *McDonnel Douglas* burden shifting framework. If the Plaintiff establishes a prima facie claim, the burden of production shifts to the City to articulate a legitimate, nondiscriminatory reason. *Flowers v. Troup Cty., Ga., Sch. Dist*., 803 F.3d 1327, 1336 (11th Cir. 2015). Once articulated, any inference of discrimination/retaliation is dropped and the burden shifts back to the Plaintiff to establish pretext. *Id*.; *Chapman v. AI Transp*., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). To survive summary judgment, the Plaintiff must establish that both the articulated

reason is a lie and the real reason for the action is intentional sex discrimination/retaliation. *Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1162-63 (11th Cir. 2006). It is not the Court's role to sit as a super-personnel department second guessing the legitimate business decisions of the City. *Flowers*, 803 F.3d at 1338.

### 1.      There was no discrimination

To establish a prima facie case of disparate treatment sex discrimination, the Plaintiff bears the burden to show that she (1) is a member of a protected class, (2) was qualified for the position, (3) suffered an adverse employment action, and (4) was replaced by someone outside of her protected class or treated more favorably than a similarly situated person outside of her protected class. *See Flowers*, 803 F.3d at 1336.

The Plaintiff alleges that she suffered an adverse action based on sex because of the alleged "minimization" of her "complaints" against Calderoni and Johnson. The Plaintiff's disagreement with the outcome of the City's investigation into her complaints is not an adverse action for Title VII. *Entrekin v. City of Panama City, Fla.*, 376 F. App'x 987, 995 (11th Cir. 2010). Moreover, the Plaintiff has failed to demonstrate how the City allegedly minimized her complaints and a basis for claiming this alleged action was because of sex. Indeed, the City investigated her complaints and ultimately terminated the two male employees she accused of harassment. There was no discrimination by the City related to the investigation.

The Plaintiff's termination from her assignment is an adverse action, but she has failed to identify any similarly situated employees outside of her protected class who were treated more favorably than her. To be an appropriate comparator, she must show that the comparator is "similarly situated in all material respects." *Lewis v. City of Union City, Ga.*, -- F.3d --, 2019

WL 1285058, *2, 8-10 (11th Cir. March 21, 2019) (en banc).  The Plaintiff's assignment was ended based on the threatening and inappropriate text messages she sent to Wright. She identifies no similarly situated male comparators who were treated more favorably.

Summary judgment should also be granted because the grounds for terminating the Plaintiff's assignment are a legitimate, nondiscriminatory reason and the Plaintiff has failed to establish that the reason is a pretext. It is undisputed that the Plaintiff sent the text messages to Wright and that Wright complained to the City about them. The decision to end the assignment was made by Crum after reviewing the text messages and determining they were threatening and inappropriate. Wright complained that the Plaintiff's conduct was harassment. Harassment is treated as a serious offense and warranted the severance of the Plaintiff's assignment with the City. Indeed, Calderoni and Johnson, both males, were terminated from their employment with the City based on the Plaintiff's allegations that they harassed her. The Plaintiff has identified no evidence that the reason offered by the City for ending her assignment is a lie and the real reason is intentional sex discrimination.

### D.    There was no retaliation

To establish a prima facie claim of retaliation, the Plaintiff must prove that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse action, and (3) the materially adverse action was causally connected to the protected activity. *Trask*, 822 F.3d at 1193-94. The Plaintiff must also show that her statutorily protected activity was the but-for cause for the materially adverse action—*i.e.*, "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533-34 (2013).

The Plaintiff cannot establish that any alleged protected activity was causally connected to the termination of her assignment or the but-for cause of it. The Plaintiff's sending of the text messages to Wright was an intervening act of misconduct which severs any causal connection between the alleged protected activity and adverse action taken. *See Hankins v. AirTran Airways, Inc*., 237 F. App'x 513, 521 (11th Cir. 2007); *Henderson v. FedEx Express*, 442 F. App'x 502, 507 (11th Cir. 2011). Moreover, once Wright made the complaint the Plaintiff could not engage in new protected activity in an effort to insulate herself from any discipline. *Alvarez v. Royal Atl. Developers, Inc*., 610 F.3d 1253, 1270 (11th Cir. 2010).

The Plaintiff also cannot establish that the City's legitimate, nondiscriminatory reason for the termination of her assignment, identified above, is a pretext for intentional retaliation. Although the Plaintiff's assignment was terminated days after her complaint, the Plaintiff cannot show her alleged protected activity was the reason. Indeed, it is undisputed that she suffered no adverse action the first time she made a complaint of alleged harassment against Johnson on May 24, 2016. Additionally, Wright made a harassment complaint against the Plaintiff and suffered no adverse action. The Plaintiff was terminated from her assignment as a result of Wright's complaint against her. It is undisputed that the Plaintiff sent the text messages to Wright. It is further undisputed that the Plaintiff never engaged in statutorily protected activity concerning any alleged conduct by Wright. The City received the Wright complaint and started to investigate that matter prior to the City finding out that the Plaintiff made a new complaint about Calderoni and Johnson. Moreover, even though the Plaintiff's assignment ended as a result of the Wright complaint, the City continued to investigate her complaint and ultimately terminated the employment of the two alleged harassers, Calderoni

and Johnson. Because she cannot establish pretext, summary judgment should be granted.

## CONCLUSION

The Court should therefore grant summary judgment for the City on all claims.

Respectfully submitted,

/s/ Thomas M. Gonzalez
Thomas M. Gonzalez (Trial Counsel)
Florida Bar No: 192341
Nathan J. Paulich
Florida Bar No: 0085190
Thompson, Sizemore, Gonzalez & Hearing, P.A.
201 North Franklin Street, Suite 1600
Tampa, Florida 33602
Mail:  P. O. Box 639
Tampa, Florida 33601
Telephone: (813) 273-0050
Facsimile: (813) 273-0072
tgonzalez@tsghlaw.com
npaulich@tsghlaw.com
Attorneys for the Defendant, City of Tampa

## CERTIFICATE OF SERIVCE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished

this 25th day of March, 2019, by CM/ECF electronic filing to the Clerk of Court and to the

following:

Arnold S. Gaines                              Yvette J. Harrell
Gaines & Nolan                                The Law Office of YJ Harrell, PLLC
2100 SE Hillmoor Drive, Suite 106             156 Frow Avenue
Port St. Lucie, Florida 34952                 Coral Gables, FL 33133
asg@againeslaw.com; asg@gainesnolan.com       counsel@yhlegal.com
Attorney for the Plaintiff                    Attorney for the Plaintiff

/s/ Thomas M. Gonzalez
Attorney