BRANDY HARRISON,

     **Plaintiff,**

v.                           **Case No. 8:17-cv-01369-T-02CPT**

CITY OF TAMPA,

     **Defendant.**

_____/

## <u>ORDER</u>

Plaintiff was employed by a staffing agency and assigned to work for the Water Department at Defendant, the City of Tampa ("City"). In her amended complaint (Dkt. 36), she alleges that she was sexually harassed when she worked at the City and that, when she complained, the City retaliated against her by terminating her work assignment.[1] The City moved for summary judgment (Dkts. 70-74), Plaintiff responded in opposition (Dkts. 77-78), and the Court heard oral argument from counsel. Upon consideration, the Court grants the City's motion.

---

[1] The amended complaint originally set forth seven claims. Dkt. 36. Counts III-V were directed to the staffing company and its president, as well as the staffing company's franchisor. *Id.* Plaintiff voluntarily dismissed her claims against those Defendants (Dkts. 40, 41, 54, 57), thereby eliminating Counts III-V from the case and leaving only the claims against the City (Counts I, II, VI, and VII).

# I.    BACKGROUND[2]

A.    <u>The Parties</u>

Plaintiff was employed by a staffing company.  Dkt. 74 ¶ 6.  The staffing

company contracted with the City to provide staffing supplements.  *Id.* ¶ 7.  As part

of that arrangement, the staffing company assigned Plaintiff to work with the City

starting in April 2016.  *Id.* ¶¶ 7-8.  As part of that assignment, Plaintiff worked as a

work order technician in the City's Water Department.  *Id.* ¶¶ 6, 8.

Separate and apart from the Water Department is the City's Human Resources

("HR") Department.  Dkt. 73 ¶ 3.  Kimberly Crum is the director of the City's HR

Department.  *Id.* ¶ 4.  Crum reviews and approves all formal disciplinary actions and

terminations of City employees.  *Id.*

The City has policies that prohibit (among other things) sexual harassment

and provide that the HR Department will investigate all complaints that the policies

have been violated.  *See, e.g.*, Dkt. 73-1 at 4-5; *see also* Dkt. 72 at  5.  The policy is

provided to City employees in the union handbook (for bargaining unit employees)

and the personnel manual (for non-bargaining unit employees), and City employees

---

[2] In keeping with the summary judgment standard, these background facts are presented
in the light most favorable to Plaintiff.  The Court notes, however, that the Case Management
and Scheduling Order provided, "To the extent that the party opposing a motion for summary
judgment disputes any facts asserted in the motion, a **separate** 'Statement of Disputed Facts'
(not exceeding 20 pages in length), with citations to the record, shall accompany the
memorandum in opposition.  All material facts set forth by the moving party shall be deemed
admitted unless controverted by a separate Statement of Disputed Facts."  Dkt. 61 at 3 (emphasis
in original).  Plaintiff did not file a separate statement of disputed facts.

sign a receipt acknowledging that they received the handbook or manual. Dkt. 72 at 6-8. Even though Plaintiff was not employed by the City, she could still complain about harassment to the City's HR Department. *Id.* at 9.

B.     Plaintiff's Work Assignment

Plaintiff's immediate City supervisor during her assignment was Ron Calderoni, the City's Water Distribution Senior Team Leader. Dkt. 74 ¶ 9. Calderoni's supervisor was Eli Franco, the City's Water Distribution and Consumer Services Manager. *Id.* ¶ 10. Plaintiff also worked with Tim Johnson, a Utility Technician II and Interim Team Leader. *Id.* ¶ 11. Plaintiff understood Johnson to be her supervisor, and he directed her to perform assignments (Dkt. 78), but he had no authority to take any disciplinary or other adverse action against Plaintiff (Dkt. 73 ¶ 8).

C.     Plaintiff's Complaint About Johnson

Plaintiff began her assignment with the City on April 3 or 4, 2016. Dkt. 71 at 21. She testified that, approximately two weeks after she began working at the City, she began having problems with Calderoni and Johnson. *Id.* at 27-28. The first time she reported these problems was on May 24, 2016. Dkt. 71-7 at 4. On that date, she

told Calderoni that, "culture-wise," she was "beginning to feel uncomfortable out there" and identified Johnson as the source of the problem. Dkt. 71 at 33.[3]

The next day (May 25, 2016), Plaintiff was called to a meeting to discuss her complaints about Johnson. Dkt. 72 at 46-47. Plaintiff, Calderoni, Franco (who was Calderoni's supervisor), and Pat Leonard (another supervisor in the Water Department) attended the meeting. *Id*. After that meeting, Employee Relations Specialist Rebecca Lukban from the City's HR Department became involved. Later on May 25, 2016, she called Plaintiff to a meeting to discuss Plaintiff's allegations. Calderoni, Franco, and Leonard also attended the meeting. Dkt. 73-2; Dkt. 72 at 47; Dkt. 71-7 at 4. During the meeting with Lukban, Plaintiff stated that she did not want to get Johnson in trouble, but that she wanted his behavior to stop. Dkt. 73-2 at 1.

Plaintiff provided the City with five notes that Johnson left on her desk. One of the notes asked Plaintiff to "[t]ake a picture of yourself." Another said, "When can I take you out for dinner [and] are we still on for Happy Hour on Friday." A third read, "Dang you look good as hell. Are we still on for Friday." Dkt. 71-1.[4]

---

[3] In her summary judgment response brief, Plaintiff asserts that Calderoni "knew before he was told that Johnson was the perpetrator of the harassing actions." Dkt. 77 at 3. The record does not support a claim that Calderoni already knew that Johnson was sexually harassing Plaintiff. Plaintiff testified that she told Calderoni that "culture-wise, [she] was beginning to feel uncomfortable," and that Calderoni said, "Is it Tim?" because Johnson would stop by her desk and stay for extended periods. Dkt. 71 at 33.

[4] Two of the notes provided to the Court are not legible. *See* Dkt. 71-1.

Plaintiff also reported that Johnson had been sending her messages via text messaging and Facebook. She provided copies of the Facebook messages from Johnson, which include comments such as: "Hey I want to tell you that you look Amazing"; "Damn you are so Sexy"; "You have a lovely smile"; "you are [an] attractive Woman"; "Your legs are so Sexy, I can spoil you"; "Sexy Red"; "[you] are a very Sexy and Pretty Woman"; "Sexy what's up"; "Sitting up thinking about you Sexy Red"; and "Sexy Lady in Black." Dkt. 71-2. He also sent her a number of emojis that can be read to indicate that Johnson was romantically attracted to Plaintiff.[5] *Id.* The messages also include some communications that are not obviously sexual in nature, including messages like, "Did you make it home safely," "Ms[.] Red, have a wonderful evening," and "How is your day going." *Id.* At the beginning of the communications, Plaintiff occasionally responded favorably. For example, when Johnson wrote, "Hey I want to tell you that you look Amazing," she responded by sending a smiley-face emoji and saying, "Thank you." *Id.* at 1. Likewise, when Johnson wrote, "Ms[.] Red, have a wonderful evening," she responded by sending another smiley-face emoji and saying, "Yourself [as well]." *Id.* at 2. And when Johnson wrote that he would give her a birthday gift the next day (followed by a winky-face emoji), Plaintiff responded with a smiley-face emoji. *Id.*

---

[5] These include emojis that show a face kissing, a face with hearts for eyes, and what appears to be a smiling dog with hearts next to it. Dkt. 71-2.

at 3. At one point, though, after Johnson wrote, "Where is the pic," Plaintiff responded, "Tim [you're] doing too much[.] Smh."[6] *Id.* at 15. Johnson then responded, "Okay, good night." *Id.*[7]

It appears that Plaintiff also reported that Johnson "liked" all of her approximately 1000 Facebook pictures, which she found concerning. Dkt. 73-2 at 9. She also seems to have reported that Johnson called her repeatedly outside of work hours. *Id.* at 7, 9.

Finally, Plaintiff reported that Johnson bought her gifts of shoes and underwear. *Id.* at 9; Dkt. 71 at 107. At her deposition, Plaintiff said that the gifts were in a bag when she got them, but she admitted that she did not return the gifts after she realized what they were. Dkt. 71 at 107.[8] She did, however, testify that she thought the gifts "crossed the line" and that they made her uncomfortable. *Id.* at 107-08.

The day after Plaintiff met with Lukban—May 26, 2016—Lukban, Franco, and Leonard questioned Johnson about Plaintiff's allegations. Dkt. 73-2 at 3-6.

---

[6] "Smh" presumably means "shaking my head."

[7] Plaintiff also testified that Johnson asked to follow her on Instagram (Dkt. 71 at 39; *see also* Dkt. 71-3), although it appears that Plaintiff told Johnson her Instagram name (Dkt. 71-2 at 8), so it is not clear if she is claiming that the Instagram request constituted harassing conduct. It is also not clear if Plaintiff reported this to the City during the May 24 and 25, 2016 meetings (or at any point thereafter). *See* Dkt. 71 at 39.

[8] Plaintiff also testified that Johnson gave her a "lotion/shower set." Dkt. 71 at 106. It is not clear if Plaintiff told the City about this particular gift during the meetings that occurred on May 24 and 25, 2016.

Johnson admitted to leaving Plaintiff notes and contacting her outside of work via text message and Facebook. *Id.* at 3. During the meeting, Johnson was cautioned to keep his distance and keep his relationship with Plaintiff work-related. *Id.* at 6; Dkt. 72 at 48-49. On May 31, 2016, Franco also sent Johnson a letter of counseling. Dkt. 73-3. The letter reads, in relevant part:

> You confirmed . . . that you had contact with [Plaintiff] outside of normal work hours through a variety of communication methods, and that the nature of that contact was personal not business. It was pointed out to you that the employee wishes for you to stop all non-work related contact with her immediately, and you agreed to comply. Failure to do so can result in a variety of steps the organization might be obligated to take including progressive discipline and referring the matter to Tampa Police.

*Id.* at 1. Franco also included copies of the City's equal opportunity policy and its anti-fraternization policy with the letter. *Id.* at 1-7. In addition, Plaintiff was told that she did not have to communicate with Johnson anymore except for work-related matters. Dkt. 71 at 111.

On June 2, 2016, Plaintiff told Calderoni that she had heard that Johnson was spreading rumors about her. Dkt. 71 at 42; Dkt. 72 at 49. There is no record evidence as to the content of those alleged rumors. *See, e.g.*, Dkt. 71 at 52; Dkt. 73-6 at 1; Dkt. 72 at 49. Plaintiff also apparently complained to Calderoni that she had "exchang[ed] words" with an employee named Mike Rafferty. Dkt. 73-6 at 1. At her deposition, she did not remember whether Rafferty had made sexual remarks

and instead testified only that he said something that she "did not like." Dkt. 71 at 42.

D.    Marquis Wright Complains About Plaintiff

At some point during her assignment with the City, Plaintiff entered into a consensual relationship with another City employee, Marquis Wright. *Id.* at 48. On June 29, 2016, Wright told Calderoni that he (Wright) had been receiving threatening text messages from Plaintiff. Dkt. 72 at 26, 50; Dkt. 74 ¶ 30. Wright apparently told Calderoni that he was in a "fatal attraction" situation with Plaintiff and that Plaintiff "won't leave him alone" and called and texted him so frequently that he turned off his phone and then blocked her number. Dkt. 73-5 at 28.[9] Calderoni reported the matter to his supervisor, Eli Franco. Dkt. 72 at 50. Franco and Leonard then met with Wright. *Id.* Wright provided copies of the text messages. *Id.* Plaintiff testified that she did not threaten Wright (Dkt. 71 at 68-70), but the messages were veiled threats of a type that might be sent in a spurned romance situation. The messages (which were forwarded from Wright to Franco and then ultimately to the City's HR Department, as indicated by the "Fwd:" before each message) read:

---

[9] The investigator's notes also state, "blocked her—100+ calls in spam. Worried—doesn't know what capable of doing." Dkt. 73-5 at 28.

Fwd:  Asking for it now so . . .  Lemme know otherwise i am gone do
what i originally planned . .  Glad u picked up the phone bc trust you
was gone have a bad night

Fwd:  U not gonna be able to run from this . . . .  Like u do everything
else

Fwd:  Yep . . . Bet that ass hush mouth nah . . .  See where being selfish
and nasty gets u . . .  Im just as nasty if not even worse . . .  You hurt
me imma hurt you back . . . .

Fwd:  Why mr. Eli [Franco] want to meet with u?  Did u say something
to anybody

Fwd: All your doing is further pissin me off . . . .

Dkt. 71-5.  Later on June 29, Franco contacted the City's HR Department.  He talked

to Lukban, told her about Wright's allegations (including the "fatal attraction"

description), and sent her the text messages at issue.  Dkt. 73-4; Dkt. 71-5.[10]

Plaintiff was unable to produce a complete set of text messages between

herself and Wright.   She testified that both her original phone and a replacement

flew out of her car window and were lost when she was in a bad car accident.  Dkt.

71 at 53-55.

---

[10] In a subsequent interview after the City terminated Plaintiff's assignment, Wright
explained that he broke off his relationship with Plaintiff because he was about to be engaged.
Dkt. 73-5 at 1.  He said that, after the breakup, things "got a little scary." *Id.* He said that
Plaintiff repeatedly called him from a City telephone (apparently after he blocked her personal
number), even though she had no business reason to call him.  *Id.*  He also explained that one
day, at work, Plaintiff threatened him, his house, and his job.  *Id.* at 1-2.  He said that he was not
going to complain but that he ultimately went to Calderoni because the harassment was
interfering with his job.  *Id.*

E.    Plaintiff Complains to Staffing Company About Calderoni and Johnson

At approximately the same time that Wright was complaining about Plaintiff, Plaintiff met with the president of the staffing company that employed her—Adam Mainzer—and complained about Calderoni and Johnson. Dkt. 71 at 50. Mainzer asked Plaintiff to write a summary of what had been occurring, and she did. *Id.* at 81-82; Dkt. 71-8. The summary—along with copies of some text messages Calderoni sent to Plaintiff—was ultimately passed along to the City's HR Department. Dkt. 71 at 81. The summary states, among other things, that Calderoni asked Plaintiff if she had ever been a stripper before and whether she had made a lot of money doing so. Dkt. 71-8 at 7. He asked her whether she had sexual intercourse over the weekend. *Id.* He touched her "inappropriately on several [occasions] <hugs, kisses, touching of private area[>]." *Id.* At her deposition, Plaintiff clarified that, to her "private area" meant either her "rear end" or the "lower front" part of her body. Dkt. 71 at 99. The summary also stated that Calderoni "unprofessionally rubbed on" Plaintiff in front of another employee and kissed Plaintiff on the lower back as she bent over in her work cubicle. Dkt. 71-8 at 7.[11]

---

[11] Plaintiff also attached a note from Johnson to the summary. That note says, "Take a picture of yourself [and] send it to me please." Dkt. 71-8 at 8; Dkt. 71 at 105. It is not clear whether the note was written before or after Johnson was warned to cease non-business communications with Plaintiff. Dkt. 73-5 at 17.

On or about June 29, 2016, Mainzer contacted Crum (the director of the City's HR Department) about Plaintiff's allegations.[12]  Dkt. 73 ¶ 14.  This was the first time anyone in a supervisory role at the City had knowledge that Plaintiff was complaining about Calderoni.  *See* Dkt. 71-7 at 4; Dkt. 72 at 56; Dkt. 78 ¶ 6. Plaintiff has averred that she did not report her complaints about Calderoni during the meetings related to her allegations about Johnson because Calderoni was present at those meetings and she "did not feel comfortable."  Dkt. 78 ¶ 6.[13]  During her deposition, she also testified that, at some point, she "attempted" to go to Franco's office to speak to him about Calderoni but that she did not think making a report to Franco would "do anything" because he and Calderoni "were very good friends." Dkt. 71 at 36-37.

On June 30, 2016, Crum and another City HR Department employee— Kimberley Marple—interviewed Calderoni about Plaintiff's allegations.  Dkt. 73-5 at 26-31; Dkt. 72 at 56.  During the interview, Calderoni admitted to hugging Plaintiff, but claimed he hugged everyone and that such acts were in his "nature."

---

[12] The record is not clear whether the City learned about Plaintiff's complaints about Calderoni before or after it learned about Wright's complaints about Plaintiff.  The only record evidence is City HR Department employee Kimberley Marple's testimony that they were "concurrent.  I mean, it was literally, like the same day or the day after.  It was very, very close." Dkt. 72 at  27.

[13] During her deposition, Plaintiff testified that she there was "no reason" why she failed to tell Calderoni that his behavior made her uncomfortable during her May 24, 2016 conversation with him, which arguably contradicts her subsequent affidavit averral.  Dkt. 71 at 35.  Nonetheless, the Court will accept the version posited in the affidavit as true for purposes of summary judgment.

Dkt. 73-5 at 26.  He also admitted kissing Plaintiff on the cheek a few times.  *Id.* at 29.

On July 1, 2016, Crum  and Marple met with Plaintiff and Mainzer.  Dkt. 72 at 57.  During the meeting, Plaintiff provided Crum and Marple text and Facebook messages from Calderoni and Johnson.  *Id.* at 52.   She recounted much of the information in the summary she wrote for Mainzer.  Dkt. 73-5 at 14-23.  She also said that Calderoni had given her a City T-shirt, which caused other employees to accuse Calderoni of favoritism and embarrassed her.  *Id.* at 14.  She said that Calderoni told her that the only way she could wear the shirt was if she put it on in front of him.  *Id.*  During her deposition, Plaintiff also testified that Calderoni made sexual advances to her "every day."  Dkt. 71 at 28.

As to Johnson, she reported that—not long after Johnson had been told to limit contact with her—another employee came to her and said that Johnson had begged him to get Plaintiff to forgive Johnson.  Dkt. 73-5 at 17.  At her deposition, Plaintiff testified that she accepted the apology.  Dkt. 71 at 111.  Later, Johnson told her (apparently in person) that "he was really sorry about what was going on."  *Id.* Plaintiff responded that "it was okay," that Johnson "wasn't a murderer or a bad person," and that he just "needed to work on" how he "dealt and approached" her. *Id.*

At her deposition, Plaintiff also testified that—after non-business communication was supposed to have stopped—Johnson sent her a book through another person. Dkt. 71 at 109-10. It appears that the book was titled "Dirty Little Secret." Dkt. 71-7 at 5. In addition, the record includes evidence suggesting that Johnson continued to send Plaintiff Facebook messages after he was warned to limit interactions with her. Dkt. 71-2 at 17 (referring to dates in June).

During the July 1 meeting with Crum, Marple, and Mainzer, Plaintiff was also asked about Wright's allegations. Dkt. 71 at 64-65; Dkt. 72 at 27. She admitted that she sent the text messages in question because Wright was not responding to her. Dkt. 73-5 at 18; *see also* Dkt. 71 at 65. During the meeting, Plaintiff was told that she would no longer be allowed to perform services for the City through the staffing company. Dkt. 71 at 19, 21; Dkt. 73 ¶ 9. Crum made the decision to end Plaintiff's assignment because the text messages Plaintiff sent to Wright were determined to be threatening and inappropriate. Dkt. 72 at 27-28, 33. The City did not direct or request that Plaintiff's staffing company take any action with respect to Plaintiff's employment with the staffing company. Dkt. 73 ¶ 9. Plaintiff's employment relationship with the staffing company remained unchanged. Dkt. 71 at 19-20. The president of the staffing company told Plaintiff that he would continue to find work for her, but he never came back to her with another placement. *Id.*

Finally, during the meeting, Plaintiff informed Crum and Marple that Wright was allegedly coming to her house during his work hours and altering work orders for the City to cover up the fact that he was spending time with her while on the clock. Dkt. 71 at 65, 67-69, 73-74. After the meeting, Water Department supervisor Leonard investigated the allegation to determine whether Wright had violated City policy by falsifying his time—an offense that could lead to termination. Dkt. 72 at 28-30. The investigation did not find any discrepancies in Wright's time records; thus, he was not disciplined. *Id.* at 29, 33-34, 54.

F. The City Investigates and Institutes Termination Proceedings Against Johnson and Calderoni

After Plaintiff's assignment with the City ended, the City's HR Department continued to investigate her allegations against Johnson and Calderoni. From July 6 to July 8, 2016, Crum and Marple interviewed multiple witnesses. Dkt. 72 at 57-58. They also interviewed Calderoni again on July 21. During that interview, Calderoni was confronted with the text messages and other evidence provided by Plaintiff. Dkt. 73-5 at 32-35. In addition, the City's HR Department interviewed Johnson on July 26 and 27, 2016. *Id.* at 7-13. Although Johnson initially denied many of the allegations, he was confronted with the text messages and other evidence provided by Plaintiff. *Id.* at 7-8. Johnson then admitted to continuing to communicate with Plaintiff despite the prior warning to cease non-business communications. *Id.*

Finally, Crum and Marple interviewed two other employees on August 2, 2016. *Id.* at 24-25, 54-58.

Based on the results of the investigation, the City prepared draft notices of disciplinary action for Calderoni and Johnson. As City employees, Calderoni and Johnson were entitled to pre-disciplinary hearings. Dkt. 72 at 59. Calderoni's pre-disciplinary hearing occurred on August 17, 2016. *Id.* at 59-60; Dkt. 73-5 at 4-6. At the conclusion of the hearing, he was informed that his employment would be terminated. Dkt. 72 at 60. Calderoni then resigned in lieu of termination. *Id.* Johnson's pre-disciplinary hearing occurred on August 18, 2016. *Id.* At the conclusion of the hearing, Johnson was informed that his employment would be terminated. *Id.*; Dkt. 73-5 at 3. He also resigned in lieu of termination. Dkt. 72 at 60.

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id*.

The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant does so, the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine factual disputes which preclude judgment as a matter of law. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-moving party's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007) (citation omitted). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*, 475 U.S. at 587.

## III.    DISCUSSION

Plaintiff asserts four claims against the City: (1) sexual discrimination and harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") (Count I); (2) common law negligent retention (Count II); (3) hostile environment sexual harassment under Title VII (Count VI); and (4) Title VII retaliation (Count VII).  For purposes of Counts I, VI, and VII, the City has not disputed that it qualifies as Plaintiff's employer for purposes of Title VII.  The City has moved for summary judgment as to all of Plaintiff's claims.  The Court discusses each count separately, below.

### A.    Count I: Title VII Sexual Discrimination and Harassment

Count I incorporates the factual allegations of the amended complaint and then states, in its entirety, "Based on the foregoing, Defendant CITY discriminated against Plaintiff HARRISON in terms, conditions and privileges of employment and subjected her to gender-based harassment and a gender-based hostile work environment because of her sex, in violation of [Title VII]."  Dkt. 36 ¶¶ 59-60. Thus, it is not clear how Count I differs from the sexual harassment claim stated in Count VI and, if so, the factual basis for Count I.  To the extent Count I is the same as the sexual harassment claim stated in Count VI, summary judgment is appropriate for the reasons discussed, *infra*.

To the extent Count I differs somehow from Count VI, summary judgment is also appropriate. Plaintiff's interrogatory responses identify the City's alleged refusal to "properly investigate [her] claims and protect [her] from further harassment" as the sole factual basis of this claim.  Dkt. 71-7 at 6-7.  In its motion, the City also posited the termination of Plaintiff's assignment with the City as a potential adverse employment action that could support Count I.  Dkt. 70 at 22-23. But Plaintiff failed to make any argument in her response brief or at oral argument in support of this claim.  And she has not established that she was replaced by a man or identified a similarly situated comparator, as is required to make out a prima facie case of sex discrimination where, as here, there is no direct evidence of discrimination.  *See Toney v. Montgomery Job Corps*, 211 F. App'x 816, 817-19 (11th Cir. 2006) (citations omitted).[14]  Thus, to the extent Count I differs from Count VI, the City's motion for summary judgment is due to be granted.

B.      Count II: Negligent Retention

In Count II, Plaintiff sets forth a claim of negligent retention.  The City has argued that this claim fails as a matter of law because sexual harassment is not a common law tort, which is required to support a claim for negligent retention.  Dkt. 70 at 14-15.  At oral argument, Plaintiff's counsel conceded that summary judgment

---

[14] In this Order, unpublished decisions of the Eleventh Circuit are cited as persuasive authority.

was appropriate on this claim.  Thus, the Court will grant the City's motion for summary judgment as to Count II.

      C.      <u>Count VI: Sexual Harassment</u>

In Count VI, Plaintiff sets forth a claim for hostile environment sexual harassment under Title VII.  To establish a prima facie case for a hostile work environment based on sexual harassment, an employee must show that:

> (1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of the employment; and (5) there is a basis for holding the employer liable for the harassment.

*Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016) (citation omitted).

As to the fifth element, if the alleged harasser is a coworker, an employer is liable only if it was negligent—that is, if it "knew or should have known of the harassing conduct but failed to take prompt remedial action."  *Smelter v. S. Home Care Servs., Inc.*, 904 F.3d 1276, 1287 (11th Cir. 2018) (internal quotation and citation omitted); *see also Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) (stating that the coworker harassment standard is a negligence standard).  If, however, the alleged harasser is a supervisor, a different standard applies.  *Vance*, 570 U.S. at 424.  If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable.  *Id.*  But if no tangible

employment action is taken, the employer may establish the affirmative defense set forth in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). To succeed on the *Faragher/Ellerth* defense, an employer must show that (1) it "exercised reasonable care to prevent and correct any harassing behavior"; and (2) the plaintiff "unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Vance*, 570 U.S. at 424 (citations omitted). Because the standard for harassment by a supervisor and a non-supervisor differs, the Court discusses the allegations against Johnson and Calderoni separately, below.

### 1. *Allegations Against Johnson*

The Court concludes that the City is entitled to summary judgment as to Plaintiff's claims that Johnson sexually harassed her. For purposes of liability for harassment under Title VII, an employee is a "supervisor" if he "is empowered by the employer to take tangible employment actions against the victim," that is, "to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 424, 431 (internal quotation and citation omitted). "The ability to direct another employee's tasks is . . . not sufficient" to qualify an employee for supervisor status. *Id.* at 439. Here, the undisputed evidence establishes that Johnson "had no authority to take any

disciplinary action or other adverse action against the Plaintiff." Dkt. 73 ¶ 8.[15]

Thus, the standard for harassment by a coworker applies.

Summary judgment is appropriate because Plaintiff cannot establish that Johnson's conduct was sufficiently severe or pervasive and because there is no basis for employer liability. To establish that harassment was sufficiently severe or pervasive, an employee must prove that her work environment was both subjectively and objectively hostile. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (citation omitted). The City makes no argument as to the subjective prong and instead focuses on the objective prong. In determining whether the harassment was objectively hostile, courts consider four factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with the employee's job performance. *Id.* (citation omitted).

Here, Johnson's conduct was certainly inappropriate. But it was not physically threatening or humiliating, and Plaintiff has not pointed the Court to any

---

[15] In opposing summary judgment, Plaintiff submitted an affidavit in which she avers that Johnson directed her work and that she understood him to be her supervisor. Dkt. 78 ¶¶ 8-16. At oral argument, Plaintiff's counsel also pointed out that Johnson's title was "Interim Team Leader." But neither of these facts suggests that Johnson had the authority to take tangible employment actions against Plaintiff, as is required under the Supreme Court's decision in *Vance v. Ball State University*.

evidence that his conduct unreasonably interfered with her job performance.[16]

Indeed, it appears that most of the offensive conduct consisted of messages sent to Plaintiff outside of work time. Johnson's conduct was also not severe. *See Lockett*, 315 F. App'x at 863, 866 (finding that alleged harassment was not severe where harasser made crude sexual remarks to plaintiff several times a week for four months and briefly touched her on two occasions). As to frequency, the Facebook messages placed into the record do not have dates on them, and Plaintiff has not pointed to any other evidence establishing how frequently Johnson engaged in offensive conduct. Regardless, even if Johnson's conduct qualified as frequent, that frequency would not make up for the absence of the other factors. *Id.* at 866 (citation omitted). To the contrary, courts have often found alleged harassment to be insufficiently severe or pervasive in cases involving significantly more serious conduct than is present here. *See Mendoza*, 195 F.3d at 1246-47 (collecting cases); *see also Lockett*, 315 F. App'x at 863, 866-67 (affirming grant of summary judgment where harasser allegedly made crude sexual remarks to plaintiff several times a week for four months and briefly touched her on two occasions because the conduct was not

---

[16] To the contrary, Plaintiff testified that she was "always referred to as a superior employee." Dkt. 71 at 84. Such testimony cuts against a finding that Johnson's conduct unreasonably interfered with her job performance. *See Lockett v. Choice Hotels Int'l, Inc.*, 315 F. App'x 862, 866-67 (11th Cir. 2009).

severe, physically threatening, or humiliating and there was no evidence that the conduct unreasonably interfered with the plaintiff's work performance).

And even if Johnson's conduct were sufficiently severe or pervasive, there would be no basis for holding the City liable. As explained above, the City can be liable for Johnson's conduct only if it knew or should have known of the harassing conduct but failed to take prompt remedial action. A remedial measure is sufficient if it is "'reasonably likely to prevent the misconduct from recurring.'" *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1305 (11th Cir. 2007) (quoting *Kilgore v. Thompson & Brock Mgmt.*, 93 F.3d 752, 754 (11th Cir. 1996)).

Here, the undisputed record evidence shows that Plaintiff complained about Johnson for the first time on May 24, 2016. She does not argue that the City had actual or constructive knowledge of the alleged harassment prior to that date. Two days after the first complaint—on May 26, 2016—Johnson was warned to cease non-work-related communications with Plaintiff. Dkt. 73-2 at 6. And, by May 31, 2016—one week after Plaintiff complained—Johnson had been issued a formal letter of counseling, which cautioned that failure to comply could result in progressive discipline or a call to the police. Dkt. 73-3. Plaintiff also admitted during her deposition that she was told that she did not need to communicate with Johnson anymore unless the communication related to work. Dkt. 71 at 111.

In determining whether remedial measures are adequate, the Eleventh Circuit has noted that "warnings and counseling of the harasser are enough . . . ." *Baldwin*, 480 F.3d at 1305 (citations omitted). Such is especially true in this case, where the alleged conduct was not particularly severe, occurred largely outside of work, and Plaintiff herself insisted that she did not want Johnson to get in trouble but merely for the communications to stop. It is true that Johnson did not heed the warning he was given, but the relevant question is not whether the employer's remedial measure actually prevented the conduct from recurring but whether it was reasonably calculated to do so. *See Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1364 (11th Cir. 1999) (finding no basis for employer liability where human resources manager failed to counsel alleged harasser and harassment allegedly continued; noting that another employee was supposed to have told the alleged harasser to stop and that plaintiff "expressed her desire that the harassment stop and also that no steps be taken at that time to alter current work assignments"). Importantly, as soon as the City learned that Johnson was continuing to have inappropriate communications with Plaintiff,[17] it launched another investigation and instituted termination proceedings against Johnson.[18] On this record, there is no evidence to support a

_____

[17] The Court recognizes that Plaintiff claims to have complained to Calderoni on June 2, 2016 that Johnson was spreading rumors about her, but Plaintiff has never specified the content of those rumors or otherwise explained how they contributed to a hostile environment based on her sex.

[18] In her response brief, Plaintiff appears to take issue with the City's decision to allow Johnson to resign in lieu of termination. Dkt. 77 at 5. It is not entirely clear that the City could

finding that the City was negligent in its handling of Plaintiff's complaints about Johnson.

2.     *Allegations Against Calderoni*

The Court also concludes that the City is entitled to summary judgment as to Plaintiff's claims of harassment against Calderoni.  The City has not disputed that Plaintiff can make out a prima facie case of a hostile work environment based on sexual harassment.  It also has not disputed that Calderoni was a supervisor.  Because Plaintiff has not alleged that Calderoni's harassment resulted in a tangible employment action, however, the City contends that summary judgment is appropriate because it can establish the *Faragher/Ellerth* affirmative defense.  The Court agrees.

As to the first prong, the City has established that it exercised reasonable care to prevent and correct harassing behavior.  It is undisputed that the City has an anti-harassment policy that provides for a reporting mechanism.  Dkt. 73-1.  It is also undisputed that the City distributes the policy to its own employees.  Dkt. 72 at 6-8.  Plaintiff has not argued that the City's complaint procedures were unreasonable or otherwise flawed, and distribution of such an adequate harassment policy is normally sufficient to show that an employer exercised reasonable care to prevent

---

have stopped Johnson from resigning, but—in any event—Plaintiff cites no cases holding that allowing a harasser to resign in lieu of termination is an inadequate remedial measure.

and correct harassing behavior.  *See, e.g.*, *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1286 (11th Cir. 2003) (citations omitted).  Plaintiff  contends that she did not receive a copy of the policy and was not informed of the policy during an orientation session.  Dkt. 71 at 26-27.  She does not, however, cite to any cases that require an employer to educate temporary workers (who are employed by another entity) on its policies to establish the *Faragher/Ellerth* defense, particularly where— as here—the facts establish that the plaintiff knew how to complain about sexual harassment and did so on two occasions.  Plaintiff also has not responded to the City's assertion that "Plaintiff knew about [the City's] enforcement mechanism because her May 24, 2016 complaint against Johnson was promptly investigated by the City's HR and remedial action was taken against Johnson."  Dkt. 70 at 20. Plaintiff's direct complaints and the City's prompt responses show that Plaintiff was well aware of how to invoke the City's anti-harassment policy.  Her complaints were addressed forthrightly and promptly.

The undisputed evidence also establishes that the City exercised reasonable care to correct Calderoni's harassing behavior.  It is undisputed that Plaintiff waited until approximately June 29, 2016 to lodge a complaint against Calderoni by contacting Mainzer.  It was not until Mainzer contacted Crum that anyone in a supervisory position with the City learned of Calderoni's allegedly harassing actions.  After Mainzer contacted Crum, the City immediately launched an

investigation into Plaintiff's allegations. That process ultimately resulted in a decision that Calderoni would be terminated. Plaintiff's only complaint about the City's efforts to correct Calderoni's behavior is that he was allowed to resign rather than be terminated. She has not, however, pointed to the Court to any cases holding that allowing an employee to resign rather than terminating him deprives the employer of the *Faragher/Ellerth* affirmative defense. Both termination and allowing an employee to resign in lieu of termination are sufficient to correct the harassing behavior, which is all that is required under the first prong of the defense.

As to the second prong, the undisputed facts show that Plaintiff unreasonably failed to take advantage of preventative or corrective opportunities because she waited more than two months (from mid-April 2016 to June 29, 2016) before complaining about Calderoni's alleged harassment. That is simply too long for *Faragher/Ellerth* purposes. *See, e.g.*, *Walton*, 347 F.3d at 1289-91 (finding that a reporting delay of two-and-a-half months after the first incidents of harassment was too long for *Faragher/Ellerth* purposes).

Plaintiff contends that she did not complain about Calderoni on May 24 and 25, 2016 because Calderoni was present in the meetings with her and she "did not feel comfortable" complaining about him in his presence. Dkt. 78 ¶ 6. She has not, however, offered an adequate reason for failing to report Calderoni's behavior outside of those meetings prior to June 29, 2016. She certainly knew that she could

do so.  During her deposition, she even testified that she thought about going to Franco's office to complain about Calderoni.  Dkt. 71 at 36-37.  It appears that she thought better of the idea because she believed that Franco and Calderoni were "very good friends" (*id.*), but such vague apprehensions are insufficient to excuse a failure to timely report sexual harassment.  *See Walton*, 347 F.3d at 1290-91 ("[A]bsent a credible threat of retaliation, . . . subjective fears of reprisal do not excuse [a] failure to report . . . alleged harassment."); *see also Baldwin*, 480 F.3d at 1307 (citation omitted) ("The *Faragher* and *Ellerth* decisions present employees who are victims of harassment with a hard choice: assist in the prevention of harassment by promptly reporting it to the employer, or lose the opportunity to successfully prosecute a Title VII claim based on the harassment.").  Accordingly, the City is entitled to summary judgment as to Plaintiff's claims of harassment by Calderoni.

D.      Count VI: Retaliation

Finally, Plaintiff contends that the City retaliated against her for complaining about sexual harassment when it ended her work assignment.  Retaliation claims must be proven under a but-for standard; thus, a plaintiff must show that she would not have suffered the adverse employment action if she had not engaged in the protected conduct.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  In the absence of direct evidence, courts employ the *McDonnell Douglas* burden-shifting framework when analyzing retaliation claims.  *Bryant v. Jones*, 575 F.3d

1281, 1307 (11th Cir. 2009) (citations omitted).  To make out a prima facie case of retaliation under Title VII, a plaintiff must show: (1) she engaged in protected activity under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action.  *Id.* at 1307-08 (citations omitted).  If the plaintiff makes out a prima facie case of retaliation, the burden shifts back to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action.  *Id.* at 1308.  Once the employer presents such a reason, the burden shifts back to the plaintiff to show that the proffered reason is pretextual.  *Id.*

As to the prima facie case, the City does not dispute that Plaintiff engaged in protected activity under Title VII by complaining about sexual harassment or that the termination of her work assignment with the City was an adverse employment action.  It does, however, dispute that Plaintiff can show a causal connection between her complaints of harassment and her termination.  Generally speaking, a plaintiff's burden as to causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action.  *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (citations omitted).  Here, Plaintiff easily meets this hurdle because her assignment with the City was terminated approximately two days after she complained about Calderoni and renewed her complaints about Johnson.  *Id.* (finding that five days between

complaint and adverse action satisfies "close temporal proximity").  Nonetheless, the City contends that Plaintiff's text messages to Wright were "intervening act[s] of misconduct" that severed any causal connection between her complaints and her termination.  Dkt. 70 at 24.

To the extent that the City learned about Plaintiff's June 29 complaints before it learned about Wright's complaints about Plaintiff's text messages, the City is correct: The harassing text messages by Plaintiff to Wright were intervening acts of misconduct that undercut any inference of causation that might otherwise be drawn from the temporal proximity between Plaintiff's complaints and her termination.  *See, e.g.*, *Henderson v. FedEx Express*, 442 F. App'x 502, 506-07 (11th Cir. 2011).  In this case, however, it is not clear which complaint came first—Wright's complaint about Plaintiff or Plaintiff's June 29 complaints about Calderoni and Johnson.  Thus, the Court will proceed with the burden-shifting analysis.

Assuming that Plaintiff has made out a prima facie case of retaliation, the burden shifts to the City to articulate a legitimate, non-retaliatory reason for terminating her assignment.  The City contends that it terminated Plaintiff's work assignment because of the threatening text messages she sent to Wright.  This is a legitimate, non-retaliatory reason.  Thus, the burden shifts back to Plaintiff to show pretext.

Plaintiff has not, however, shown that the City's reason is pretextual. "To show pretext, a plaintiff must come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Hurlbert v. St. Mary's Health Care Sys., Inc*., 439 F.3d 1286, 1298 (11th Cir. 2006) (internal quotation and citation omitted). While close temporal proximity between the alleged retaliatory acts and the protected activity may be evidence of pretext, it is insufficient by itself to establish pretext. *McQueen v. Ala. Dep't of Transp.*, __ F. App'x __, 2019 WL 1773270, at *4 (11th Cir. April 23, 2019) (citation omitted). Moreover, a plaintiff cannot insulate herself from termination by preemptively making a harassment complaint. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1270 (11th Cir. 2010) ("We emphasize that Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint. The record does establish that [the defendant] had legitimate non-discriminatory reasons to fire [the plaintiff] before she complained, and it remained free to act on those reasons afterward."). Thus, to the extent that Plaintiff made her June 29 complaints after the City learned about Wright's complaints, the timing of events is not helpful to her.

Pretext may, however, be shown in other ways, such as showing that: (1) the employer has failed to clearly and consistently articulate the reason for the employee's discharge; (2) the employer has deviated from its own standard procedures; or (3) a similarly situated employee was treated more favorably. *See Hurlbert*, 439 F.3d at 1298-99 (citations omitted); *Walker v. St. Joseph's/Candler Health Sys., Inc*., 506 F. App'x 886, 889 (11th Cir. 2013) (citations omitted). In this case, Plaintiff has not pointed to any comparators who were treated more favorably. She also does not appear to allege that the City deviated from its own standard procedures in terminating her assignment. Instead, at oral argument (although not in the response brief), Plaintiff's counsel suggested that the timing of Plaintiff's termination was suspicious. To make this argument, counsel asserted that the City was contending that it terminated Plaintiff's assignment because she admitted to sending the harassing text messages during her July 1 meeting with Crum and Marple. Counsel then pointed to evidence suggesting that Calderoni knew that Plaintiff's assignment was going to be terminated on June 30—one day earlier. Dkt. 73-5 at 18. Counsel suggested that the timing was suspicious because Calderoni seemed to know that Plaintiff would be terminated before she admitted to sending the text messages.

This argument rests on a misreading of the evidence. The City has not contended that it terminated Plaintiff's assignment because she admitted to sending

the text messages. It has contended only that the assignment was terminated because Plaintiff did, in fact, send the messages (Dkt. 73 ¶ 9; Dkt. 72 at 27-28)—a fact that was confirmed as soon as the City's HR representatives saw the messages. The fact that Calderoni knew about the termination on June 30 thus suggests only that the decision may have been made before it was communicated to Plaintiff on July 1. It certainly does not suggest that the real reason for the termination was retaliation—let alone that retaliation was the but-for cause of the termination. Because Plaintiff cannot show that the reason for her termination was pretextual, the City is entitled to summary judgment on Count VII.

## IV.   CONCLUSION

For the reasons stated above, the City's motion for summary judgment (Dkt. 70) is granted. The Clerk is directed to enter judgment for the City on Counts I, II, VI, and VII of Plaintiff's amended complaint, terminate any pending motions, and close the case.

**DONE AND ORDERED** at Tampa, Florida, on June 4, 2019.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record